IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 27, 2016 Session

## RANDALL CHARLES HARRELL v. CHASSITY NECOLE HARRELL

**Appeal from the General Sessions Court for Wilson County**
**No. 2010DC153     John Thomas Gwin, Judge**

_____

**No. M2014-02363-COA-R3-CV – Filed April 4, 2016**

_____

This appeal concerns a post-divorce modification of child custody. Randall Charles Harrell ("Father") filed a petition against his ex-wife Chassity Necole Harrell ("Mother") in the General Sessions Court for Wilson County ("the Trial Court") to modify the permanent parenting plan concerning the parties' two minor children. Father sought to be designated primary residential parent based, in part, upon Mother's alleged drug abuse and instability. After a hearing, the Trial Court found a material change in circumstances, designated Father the primary residential parent, and entered a new parenting plan accordingly. Mother appeals to this Court, arguing, among other things, that the Trial Court erred in finding a material change of circumstances and in considering the unsworn testimony of the children. Finding no reversible error, we affirm the judgment of the Trial Court in its entirety.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court
Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Melanie R. Bean, Lebanon, Tennessee, for the appellant, Chassity Necole Harrell.

John L. Meadows, Lebanon, Tennessee, for the appellee, Randall Charles Harrell.

# OPINION

## Background

After approximately one year of marriage, Mother and Father were divorced in December 2010. The final decree of divorce incorporated an agreed parenting plan whereby the parties would exercise equal parenting time of the parties' two minor sons, born in 2003 and 2007 respectively. Mother is the biological parent of the children. Father is the adoptive father of the children. Following the parties' 2010 divorce, problems arose between the parties as to the permanent parenting plan, and litigation ensued. In March 2013, in response to a motion filed by Mother, the Trial Court declined to find a material change in circumstances and enter a new parenting plan. The current appeal has its roots in Father's September 2013 petition to modify the permanent parenting plan. Father sought to be designated primary residential parent based, in part, upon Mother's alleged drug use and instability. This matter was tried over the course of two days in March and May of 2014. We now summarize the pertinent testimony from trial.

Testimony began with the parties' ten year old son. The Trial Court asked the child—unsworn and in chambers—a series of questions regarding whether he understood what the truth means as opposed to a lie, and whether he understood the consequences of lying. The child appeared to have difficulty in articulating a response, often nodding, shrugging, or saying "uh huh." The Trial Court sent the child out of the chambers. However, Mother's counsel requested that the Trial Court "take another run at it" and bring the child back in for more questioning. The Trial Court agreed, stating: "[H]e was abjectly unable . . . to appreciate the fact that if he told a lie, there was any recourse. But I'm going to - - based upon y'all's statements . . . I'm going to bring him back." The ten year old child proceeded to testify. The child was asked about whether his parents influenced his testimony. The following exchange occurred:

> Q. What did your dad say about today?
> A. He said, Don't tell a lie no matter what you're doing. Sometimes it might be hard to, but just tell the truth.
>
> ***
>
> Q. What did your mom tell you?
> A. She said, We have court on Friday, and that -- tell the truth, too.
> Q. She didn't say anything about not talking about all the men she's lived with or anything?

A. Yeah, she said, We'll just – we're just going to be friends but don't tell them we was going to be boyfriend because, she said, we're just going to be friends.

The child stated that, in his view, the men were Mother's boyfriends rather than just friends. The child was asked about Mother's boyfriends. The child testified:

Q. And your mom is kind of -- and I hate to get into this . . . but she's kind of with Scott and then --
A. Uh-huh.
Q. -- Chad and then Scott and Chad, and she's, moved what? Maybe five or six times in the past year?
A. Uh-huh.
Q. Is that correct?
A. Uh-huh. Yes, sir.
Q. And you and your little brother may be staying over at Scott's one week and over at Chad's the next, right?
A. Yes, sir.

The child continued his testimony, stating that he had stayed mostly with Scott. The child testified that he sometimes had been late for school when staying with Chad in Hermitage, but that he was never late for school when staying with Father. The child stated that he liked Father's new wife. The child then was asked about his medication. The child, who suffers from an attention deficit medical issue, stated that he was supposed to take his medication and that Father always provided it to him. Regarding Mother, however, the Child stated that she "told me to lie to my dad once that I took it." Mother also forgot to give it to the child on occasion. When asked about Mother's boyfriend status, the child testified: "She was with Scott before Chad. Scott, Chad, and then Scott." The Trial Court credited the child with being truthful. Following the ten year old child's testimony, his six year old brother was called in to testify. However, the younger child was asked only about sports and school and about nothing material to the present case.

Father testified. By the second day of trial, Father had obtained a job through an agency at Nissan. Father stated his reasons for filing his petition to modify custody in the first place:

In the fall, was -- I was -- I -- it was the -- the whole reason I came to you in the fall was the instability and then the drug use, and I had -- I was concerned about them being with -- somewhere that they didn't know where they were. And I know when we were here in January, she was

-3-

living with her grandma and she moved with Scott. And, you know, it was good, pretty much, until -- up until when she moved to Hermitage. She -- we agreed that since the kids didn't know Chad, that they -- she brought them to my house during her week and they stayed with me at night during her week because we both agreed that they shouldn't stay overnight with a guy that they didn't know. And then when it came the weekend, she just kept them there.

Tracey Scot[1] Brady ("Brady"), one of Mother's boyfriends, testified. Brady testified that Mother was his current girlfriend, although he added that they had been together off and on a number of times. Brady described Mother's drug issues:

Q. And [Mother] has a problem with drugs, doesn't she?
A. I can't say that she has an extreme problem. I can say that everybody -- like those things you -- even when I had surgery, you can't just stop. I mean, you -- you have it off and on, and it --
Q. These are oxycodones, right?

***

THE WITNESS: No, they're -- they're just Lortabs. The Tylenol with the -- with the -- that kick of codeine at times. So they're something that you just -- I mean, if you take one, you just feel bad, and you know, especially if you have them for a few days. So, you know, it's -- my opinion, it's rampant nationwide, and so it's -- it's -- it's an issue for a lot of people, but --
Q. It's definitely an issue for Ms. Harrell, right?
A. I don't -- at times, yes.
Q. Okay. And it's an ongoing issue, correct?
A. Yes, periodically. Depending on what she's going through.

Mother testified. Mother's then-counsel, in his opening statement, acknowledged that Mother had been untruthful in her discovery responses regarding her use of prescription medication. Mother stated that she lived with the parties' two children in her apartment. Mother works as a college admissions representative. Mother stated that she maintained an on-again, off-again relationship with Brady. Mother testified that for the majority of the children's lives, they had lived either with Brady, at her old rental house, or, as now, at her apartment. Mother testified to her use of drugs. Mother was prescribed Adderall. Mother had been prescribed Lortab in March 2014.

---

[1] Brady's name often is spelled "Scott" in the record, but he testified that his name contains only one "t."

-4-

Mother admitted to swapping pills with Brady. However, Mother staunchly denied that she had sold drugs. Mother offered tortured explanations for various text messages tending to undercut her testimony on this factual issue:

Q. Quote, "Yes, yours are what I took. I have been selling them for weeks, jerk. How else you think we got all those groceries?" Did I read that correctly?
A. Yes, but I don't know what that was talking about. There's six or seven of them, what proof, I don't know where that was even from.
Q. I'll let you take it from the top. You lead off, "Can you spare a tick of energy," and there's a picture of a pill. "If not, it's okay." That was from you, correct?
A. Yes. That's the one my son seen.
Q. And we can agree that's a picture of a pill?
A. Correct.
Q. And then it leads forward and you say, quote, "It's not your response to give me yours. I just get moody when I run out. Sorry, baby." Did I read that correctly?
A. That's not me, that's him.
Q. That's not you on the left side tracking right under where we talked about the picture of the pill, ma'am?
A. I don't know, Your Honor, if that was me or if that was him. . . .

***

A. Can I see the rest of them?
Q. You can look through all of them. The question is, were you selling pills?
A. No, I answered that, because this is talking about . . . his cousin. That's why I feel like this is his, he wants to cook steaks . . . .
Q. And we can agree that's your number across the top, correct?
A. Right, but I didn't have a prescription at the time. It says, "I just get moody when I run out." I didn't run out, he did, of Adderall. He had a prescription of Adderall.
THE COURT: Let me see 16, please, ma'am.
BY MR. MEADOWS:
Q. And, again, tracking it through the fourth number, it says, quote, "I'm going to forget about you, goodbye Scitt," S-C-I-T-T. Did I read that correctly?
A. You did.

Q. And that's listed under your phone number in the same light gray but you are telling us today under oath that's not your communication?

A. No, I'm saying I didn't know. I don't remember these texts, number one, but it looks like that's me -- it looks like the light gray is me on the side page. It says, "goodbye Scitt," which I'm assuming was Scott.

Q. Let's turn to the third page where it says, quote, "Yes, yours are what I took. I have been selling them for weeks, jerk. How else you think we got all those groceries." First off, did I read that correctly?

A. You did.

Q. And that's under the phone number you've told me is yours?

A. Uh-huh.

Q. You're saying that this is not your communication?

A. It looks like it is my communication.

Q. Okay. So you were selling pills, correct?

A. No, sir, I did not sell pills. I don't know what that's referring to.

Q. Okay. I'll move on. You understand Mr. Harrell had these texts about you taking pills and selling them, and he went and filed this petition?

A. To buy groceries, and I got food stamps all -- that whole summer. There would be no need for me to sell pills. I got unemployment, I got food stamps, I didn't have rent. There was no need for me to sell pills. I sold my TV at the very end after all of my severance money had run out and my bank account was overdrawn.

Q. Do you understand these texts I've shown you is why Mr. Harrell filed this out of concern for these boys?

A. I thought I heard him say today he didn't get those until after he filed.

Q. I mean, you've called the DCS and police on him. If you knew he was selling drugs and taking them, would you not take action for these boys, ma'am?

A. If I thought he was selling drugs, yes.

In June 2014, the Trial Court entered an order designating Father the primary residential parent of the children and entering a new parenting plan reflecting this change. The Trial Court found and held, in relevant part:

1. The parties are bereft of any ability to cooperate in the parenting of these children;

2. This failure to cooperate is particularly troublesome when, as here, the parties are currently sharing a week-to-week parenting schedule. The current arrangement is no longer in the children's best interests, for reasons to be set out hereinbelow;

-6-

3. There has clearly been a material and significant change of circumstances relating to the minor children:

4. Mother has been untruthful with the Court on significant matters, starting literally the day after the last trial in this cause;

5. Mother has told one of the children to be untruthful with the Court about the status of her boy "friends";

6. Mother has literally asked one of the children which of the boyfriends he prefers the Mother marry. This places an unreasonable emotional burden on the minor child;

7. Mother has been unable to regularly meet school attendance schedules in a timely fashion;

8. Mother took one child out of his favorite sport — football — out of anger with Father;

9. Mother is less reliable than Father on the issue of the child's ADHA medicine and, on one occasion, told a child to lie to Father about having taken the medicine;

10. Mother and the boyfriend Scott failed to take the minor children's presence into account during sessions of fighting and cursing;

11. Mother also testified untruthfully about a detainer warrant. Regretfully, Mother's veracity is poor in several areas;

12. Mother also made an unfounded complaint to the Department of Children's Services against Father, and initiated an unfounded welfare check by the Lebanon Police Department;

13. Father has a reliable support group that can, and does, assist him with parenting the children;

14. Mother goes back and forth between boyfriends, and that her credibility regarding this is poor;

15. The people who frequent Father's home are better for the children than those who have been frequenting the home of Mother. Based upon the testimony and the history of these parties, the Court can reasonably expect this behavior to continue.

16. The preponderance of the evidence is that Mother has engaged in pill swapping (Adderol$^{TM}$ and Lortab$^{TM}$) and the sale of scheduled narcotics to financially support herself and her paramour Scott. Scott, with whom Mother was "on and off" for two years, describes the sale/trade of Lortab$^{TM}$ as follows: "It's just Tylenol and a kick of codeine"; "It's rampant nationwide"; and "it's just a little kick". Clearly, this behavior and mindset is not in the best interests of these, or any other, minor children;

17. Mother has been more active than has Father in the area of purchasing presents for the children to give to Father and others;

18. Mother has encouraged a good relationship between Father, step-mother, and the children;

19. The totality of the evidence preponderates in favor of a new Permanent Parenting Plan (attached hereto as **"Exhibit 1"**) naming Father as primary residential parent and providing Mother with parenting time calculated to be in the best interests of the minor children given Mother's behaviors and predilections set out in the testimony;

20. Father is entitled to a judgment against Mother for a portion of his reasonable attorney fees in this cause, which amount the Court finds to be $7,500.00, for which execution may issue if necessary; . . .

Mother filed a motion to alter or amend. Later, with new counsel, Mother filed an amended motion to alter or amend. In October 2014, the Trial Court denied Mother's amended motion to alter or amend. In its order, the Trial Court stated in relevant part:

1. The Court does not have any question that a material change of circumstances occurred in regard to a change of residential placement for the two minor children at issue in this cause;

2. Mother was in and out of a relationship with one boyfriend and the Court interviewed the parties' minor child;

3. In regard to allegations of selling illegal drugs, Mother stuck by her story that she was selling hair bows;

4. The Court did not accredit the aforementioned testimony without corroborating testimony from Mother's then boyfriend, Scott;

5. The Court believes it was ridiculous to think Mother was talking about hair bows. The Court believes beyond a reasonable doubt that Mother was talking about selling illegal drugs in the texts messages introduced into evidence at the Trial in this matter;

6. The Court is further troubled with Mother's untruthfulness with the Court because it impacts her credibility as well as shows that Mother knew that the sale of illegal drugs was wrong;

7. The Court was further disturbed by the fact that Mother had told one of her minor children to pick between two of her boyfriends because the Mother could not make up her mind which one to marry;

8. The Court stands by all of its findings and rulings in the Trial of this matter without any alteration or change of the Court's Order of June 11, 2014;

9. Mother's Amended Motion to Alter and/or Amend and/or for a new Trial is denied;

10. Father's request for Attorney's Fees incurred in defending Mother's Rule 59 Motion is denied; and

11. This is a Final Judgment per T.R. Civ. P. 54.02.

Mother timely filed an appeal to this Court.

## Discussion

Although not stated exactly as such, Mother raises the following issues on appeal: 1) whether the Trial Court erred in relying upon the unsworn testimony of the minor children; 2) whether the Trial Court erred in finding a material change in circumstances and that a change in the primary residential parent is in the children's best interest; 3) whether, should this Court affirm the Trial Court's judgment designating Father as primary residential parent, the evidence preponderates against the number of days apportioned to Mother in the parenting plan; 4) whether the Trial Court erred in its credibility determination regarding Mother; and, 5) whether the Trial Court erred in awarding attorney's fees to Father. Father raises his own issue of whether this appeal is frivolous, and whether, consequently, he should be awarded his attorney's fees incurred on appeal.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court erred in relying upon the unsworn testimony of the minor children. Mother argues that the Trial Court never should have considered the unsworn testimony of the minor children, particularly that of the older child. According to Mother, the children's competency—particularly, their ability to understand the truth and to understand the consequences of lying—never was established. Thus, argues Mother, the entire judicial process was damaged by the consideration of the unsworn testimony and, therefore, Mother is entitled to a new trial. Father observes in response, among other things, that Mother's then-counsel did not object to the unsworn testimony.

This Court previously has addressed a similar scenario. In *Cupples v. Cupples*, we stated the following in regard to unsworn testimony from a child in a custody case:

-9-

Wife additionally challenges the trial court's custody decision based on the fact that her son was not placed under oath when testifying as to his preference before the trial judge.

\*\*\*

An issue in *Hewlett* was whether the trial court erred in failing to grant defense counsel's motion for a mistrial after the trial court inadvertently received a witness's unsworn testimony. After discovery by counsel, the witness took oath that his prior testimony was truthful. *Hewlett* found the trial court's hearing of such testimony insufficient grounds for reversal and, in quoting 98 C.J.S. *Witnesses*, § 320, reasoned as follows:

> "The admission of unsworn testimony in a case is a mere irregularity which violates no constitutional provision, and does not [affect] the jurisdiction of the tribunal, and if unsworn testimony is received in evidence without objection, it may be considered the same as any other evidence in the case."

*Hewlett*, 517 S.W.2d at 766-67 (alteration added). The record before us does not reflect that counsel objected to the taking of the child's unsworn testimony at the trial level. A party may not save an infirmity in the proceedings as an "ace in the hole" to be used in case of an adverse decision or suppressed in event of a favorable decision. *Harwell v. Walton*, 820 S.W.2d 116, 120 (Tenn. App. 1991). We conclude that Wife has waived this argument on appeal.

*Cupples v. Cupples*, No. 02A01-9408-CH-00193, 1995 WL 650134, at *4 (Tenn. Ct. App. Nov. 2, 1995), *Rule 11 perm. app. denied Feb. 26, 1996.*

We find *Cupples* persuasive on this issue. Mother cannot now argue that the children's unsworn testimony should not be considered when she, through her then-counsel, took a contradictory position at trial. Indeed, Mother's then-counsel even affirmatively requested that the Trial Court 'try again' with respect to eliciting testimony from the older child, and the Trial Court then did so. While Mother now may regret her previous counsel's tactical decision in that instance, she may not now seek to have that unsworn testimony excluded in contradiction to her original stance at trial. The younger child was not questioned about anything relevant to any issue at trial or on appeal. This issue is waived, and we consider the children's unsworn testimony the same as the other evidence contained in the record on appeal.

-10-

We next address whether the Trial Court erred in finding a material change in circumstances and that a change in the primary residential parent is in the children's best interest. This Court has outlined the analysis to be employed when a child's primary residential parent, as opposed to simply the details of the residential schedule, is at issue:

> Adjudicating disputes over who should be designated the primary residential parent is one of a court's greatest responsibilities. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). A court's designation of the primary residential parent as part of a final decree of divorce is considered res judicata upon the facts in existence or those which were reasonably foreseeable when the decision was made. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). However, because circumstances change in unanticipated ways, courts are statutorily empowered to modify a primary residential parent designation. *See* Tenn. Code Ann. § 36-6-101(a)(1) (A decree awarding custody of minor child "shall remain within the control of the court and be subject to such changes or modification as the exigencies of the case may require.").

> Courts apply a two-step analysis to requests to change the primary residential parent designation. *Keisling v. Keisling*, 196 S.W.3d 703, 718 (Tenn. Ct. App. 2005). The threshold issue is whether a material change in circumstance has occurred since the court's prior custody order. *See Armbrister v. Armbrister*, 414 S.W.3d 685, 697-98 (Tenn. 2013); Tenn. Code Ann. 36-6-101(a)(2)(B). Only if a material change in circumstance has occurred do we consider whether a modification is in the child's best interest. *Armbrister*, 414 S.W.3d at 705. The "determinations of whether a material change of circumstances has occurred and where the best interests of the child lie are factual questions." *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007).

*Skowronski v. Wade*, No. M2014-01501-COA-R3-CV, 2015 WL 6509296, at *5 (Tenn. Ct. App. Oct. 27, 2015), *no appl. perm. appeal filed*.

> Regarding a material change in circumstances, this Court has stated:

> There is no bright line rule for determining when a change in circumstance is material enough to warrant changing an existing custody arrangement. *Keisling*, 196 S.W.3d at 718. Instead, when making this determination, courts should consider: "(1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was

-11-

not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way." *Cranston*, 106 S.W.3d at 644. A material change in circumstance does not require a showing of a substantial risk of harm to the child. Tenn. Code Ann. § 36-6-101(a)(2)(B). Such a change includes "circumstances that make the parenting plan no longer in the best interests of the child." *Id*.

*Robinson v. Robinson*, No. M2014-00431-COA-R3-CV, 2015 WL 1259265, at *3 (Tenn. Ct. App. March 16, 2015), *no appl. perm. appeal filed*. (Footnote omitted).

In the present case, the Trial Court made detailed findings regarding what it found amounted to a material change in circumstances. These circumstances include Mother's overall pattern of instability, moving rapidly between boyfriends, and engaging in illicit drug activity, all of which significantly affect the children's well-being. The evidence does not preponderate against the Trial Court's findings on this issue. We find, as did the Trial Court, that a material change in circumstances has been established in this case.

This issue presents a two-part inquiry, and finding a material change in circumstances does not automatically result in a change in primary residential parent. We next must consider whether modification is in the children's best interest. As relevant, the following factors are to be considered as regards the children's best interest:

(a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1)-(10), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

-12-

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers. The court may, when it deems appropriate, order an examination of a party pursuant to Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party pursuant to § 33-3-105(3). The court order required by § 33-3-105(3) shall contain a qualified protective order that, at a minimum, expressly limits the dissemination of confidential protected mental health information for the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

Tenn. Code Ann. § 36-6-106(a).[2]

The Trial Court made detailed findings as to best interest as well. The evidence does not preponderate against any of the Trial Court's findings relative to this issue. The evidence is that Father offers far more stability for the children. Mother, unfortunately, has engaged in illicit drug activity and shown a marked instability in her moving both herself and, to a resulting extent, the children between boyfriends, facts which have obvious and significant negative bearing on the children's well-being and best interest. We note that neither parent has been totally innocent nor totally at fault in this bitter litigation. Nevertheless, the evidence does not preponderate against the Trial Court's findings regarding best interest, and we find that the best interest of the children is served by the modification of the permanent parenting plan as so found and implemented by the Trial Court.

We next address whether the evidence preponderates against the number of days apportioned to Mother in the parenting plan. Mother was apportioned 82 days of parenting time in the parenting plan. Mother asserts she was entitled to 92 days of

---

[2] The trial in this case took place before the effective date of the 2014 amendments to the statute, which were enacted in a bid to consolidate the variety of factors abounding in the code concerning custodial arrangements and residential schedules. We therefore apply the pre-2014 version of the statute. Regardless, it is our view that application of the 2014 revised factors to this case would not change the outcome. Additionally, the Trial Court failed to identify the specific factors it applied, as might be ideal. Nevertheless, the Trial Court's detailed findings correlate to the applicable best interest factors.

-14-

parenting time.  Mother cites to no facts or law and makes a cursory argument as to this issue.  Discerning no reversible error in the Trial Court's apportionment of parenting days, we affirm the Trial Court on this issue.

We next address whether the Trial Court erred in its credibility determination regarding Mother.  The bulk of Mother's argument on this issue relates to objections to the ten year old child's testimony, an issue we already have resolved.  Trial courts are afforded considerable deference in their determinations of witness credibility.  As our Supreme Court has instructed:

> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony.  *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)).  Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary.  *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

We find no evidence in the record rising to the level of clear and convincing such that would overturn the Trial Court's credibility determination against Mother.  On the contrary, whether it is the ten year old child's statements regarding Mother's urging him to lie about her boyfriends and his medication, or Mother's acknowledged untruthfulness in her discovery responses, or Mother's highly dubious testimony denying her involvement in drug activity when text messages revealing the opposite were presented to her, the record supports the Trial Court's determination that Mother lacked credibility as a witness.  We affirm the Trial Court on this issue.

We next address whether the Trial Court erred in awarding attorney's fees to Father.  Mother's argument as to this issue is quite brief and includes no citations to law or the record.  Mother simply argues that the award of attorney's fees in the amount of $7,500 is "punitive" in nature and that she lacks the ability to pay.  Respectfully, Mother's cursory argument on this issue lacks a legal or factual foundation, and we find no basis upon which to reverse the Trial Court's award of attorney's fees to Father.

The final issue we address is Father's separate issue of whether this appeal is frivolous, and whether, consequently, he should be awarded his attorney's fees incurred on appeal. Mother's arguments are not so utterly devoid of merit as to render her appeal frivolous. We decline either to find this appeal frivolous or to award Father any attorney's fees incurred on appeal. We affirm the judgment of the Trial Court in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Chassity Necole Harrell, and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE